UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sierra Club Northstar Chapter and Friends
of the Boundary Waters Wilderness,

       Plaintiffs,

v.
                                       Civ. No. 05-667 (JNE/SRN)
                                       ORDER

Dale Bosworth, as Chief of the U.S. Forest Service,
and Mike Johanns, as Secretary of the U.S.
Department of Agriculture,

       Defendants,

and

Minnesota Forest Industries, Inc., Minnesota
Timber Producers Association, Hedstrom Lumber
Company, Inc., North Shore Forest Products, Inc.,
St. Louis County Land Department, and
Lake County, on behalf of the State of Minnesota,

       Defendant-Intervenors.

---

Mandi L. Hill, Esq., and Richard A. Duncan, Esq., Faegre & Benson, LLP, appeared for Plaintiffs Sierra Club Northstar Chapter and Friends of the Boundary Waters Wilderness.

Friedrich A.P. Siekert, Esq., Assistant United States Attorney, Office of the United States Attorney for the District of Minnesota, appeared for Defendants Dale Bosworth and Mike Johanns.

David R. Oberstar, Esq., Fryberger Buchanan Smith & Frederick, appeared for Defendant-Intervenors Minnesota Forest Industries, Inc., Minnesota Timber Producers Association, Hedstrom Lumber Company, Inc., and North Shore Forest Products, Inc.

Barbara A. Russ, Esq., Office of the St. Louis County Attorney, appeared for Defendant-Intervenor St. Louis County Land Department.

Daniel H. Mundt, Esq., Mundt Law Office, appeared for Defendant-Intervenor Lake County.

---

Sierra Club Northstar Chapter (Sierra Club) and Friends of the Boundary Waters Wilderness (Friends) (collectively, Plaintiffs) brought this action against Dale Bosworth, as Chief of the U.S. Forest Service, and Mike Johanns, as Secretary of the U.S. Department of Agriculture (together, Federal Defendants), and Minnesota Forest Industries, Minnesota Timber Producers Association, Hedstrom Lumber Company, North Shore Forest Products, St. Louis County Land Department, and Lake County (together, Defendant-Intervenors), under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370f (2000), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 553-559, 701-706 (2000). The matter is before the Court on Plaintiffs' motion for a preliminary injunction, summary judgment, and a permanent injunction; Federal Defendants' and Defendant-Intervenors' (collectively, Defendants) cross-motions for summary judgment; and Lake County's motions to dismiss and to supplement the administrative record. For the reasons set forth below, the Court grants Defendants' motions for summary judgment and denies Plaintiffs' motions. The Court also denies Lake County's motions to dismiss and to supplement the administrative record.

## I.      BACKGROUND

This case involves certain forest management activities, including timber harvesting, authorized by the United States Forest Service (Forest Service) and known as the Tomahawk Project. The Tomahawk Project Area (TPA) is in a portion of the Superior National Forest (SNF). The TPA lies in the northern portion of an area known as the Inga-Isabella watershed. The Inga-Isabella watershed is located on the Kawashiwi and Tofte Ranger Districts of the SNF in northeastern Minnesota. The TPA is bisected by a stretch of the Tomahawk Road and borders the Boundary Waters Canoe Area Wilderness (BWCAW). The TPA encompasses four entry points into the BWCAW.

The Tomahawk Project was first proposed in July 2003.  While the Tomahawk Project was being developed, the Forest Service was also revising the Land and Resource Management Plan for the SNF.  As part of that plan, the Forest Service prepared the Forest Service Plan Revision Environmental Impact Statement.  The revised plan was adopted on July 30, 2004 (2004 Forest Plan).  The 2004 Forest Plan divided the SNF into several management areas and landscape ecosystems.  It also established, among other things, forest-wide desired conditions; forest-wide biological, physical, social, and economic objectives; and desired conditions for each landscape ecosystem.

In April 2004, the Forest Service prepared the TPA Environmental Assessment (TPEA) pursuant to NEPA.  The review process for the TPEA included forming an Interdisciplinary Planning Team (IPT) of specialists in forestry, biology, engineering, fire management, soils, recreation, wilderness, history, timber, wildlife, and other specialties; soliciting public comment; soliciting comment from federal and state government agencies and local American Indian tribes; and evaluating and addressing comments received.  In the TPEA, the Forest Service explained that "[t]he Tomahawk interdisciplinary team reviewed the selected recommendations from the Inga-Isabella watershed analysis, Forest Plan direction, new information gathered from the Forest Plan revision, and existing conditions in the area and identified the needs in the [TPA]."[1]  These needs include:  (1) the need to maintain and an opportunity to increase the pine

---

[1]     In July 2003, the Forest Service analyzed the condition of the Inga-Isabella watershed in the SNF.  The TPEA noted:

> [The assessment of the Inga-Isabella watershed] identified key resource issues, examined past and current conditions and processes on the landscape, and made recommendations.  A roads analysis was conducted in conjunction with the watershed assessment.  The assessment served as a midlevel assessment of the watershed; however it did not initiate or result in land management activities or select specific projects for implementation.  The District Ranger (decision officer)

component; (2) the need to move the age class distribution toward age class objectives in the current Forest Plan[2]; (3) the need to improve forest health and productivity of poorly stocked or decadent stands; (4) the need to maintain or improve habitat for viable population levels of all native and desired nonnative species; (5) the need to determine locations of gravel sources for road construction and maintenance and manage the road system for the minimum needed that is responsive to public needs and has minimal adverse environmental effects; and (6) the need to provide timber products to the local economy.

The TPEA presented four alternative management actions. The IPT "examined and analyzed data to estimate the effects of each alternative." Specifically, in Chapter 3 of the TPEA, three levels of effects (direct, indirect, and cumulative) on the physical, biological, social, and economic environment are described. The Forest Service also developed and detailed in the TPEA site-specific mitigation to reduce impacts of the planned action.

The Sierra Club and Friends submitted comments on the TPEA. On September 17, 2004, the Forest Service issued its *Decision Notice and Finding of No Significant Impact: Tomahawk Project Area Environmental Assessment* (DN/FONSI). In the DN/FONSI, the Forest Service concluded that Alternative 4 studied in the TPEA best meets the direction and objectives set forth in the 2004 Forest Plan and adopted that alternative with minor changes. The DN/FONSI also established mitigation measures. The Forest Service determined that Alternative 4 "does not constitute a major Federal action, individually or cumulatively, and will not significantly affect

---

reviewed the recommendations and selected the ones to carry forward in this project analysis.

[2]     The TPEA acknowledged a "very large 'bulge' in age class composition of forest vegetation that is 51 to 60 years in age . . . [and that] [v]egetation management activities in the [TPA] need to reduce this bulge and increase the acreage of the 0-10 year age class (through harvest) while retaining older age classes in longer-lived species."

the quality of the human environment."  The Forest Service determined no environmental impact statement (EIS) was necessary.

Alternative 4 includes, among other treatments, a combination of clear-cutting, partial-cut harvest, commercial thinning, and prescribed burning.  Alternative 4 also authorizes the construction of temporary access roads, the conversion of unclassified National Forest System (NFS) roads, the reuse of existing NFS road corridors, and the decommissioning of unclassified and NFS roads.  Plaintiffs argue that Alternative 4 involves the most timber harvest intensive measures of the alternatives studied in the TPEA.  Plaintiffs appealed the DN/FONSI.  On December 13, 2004, the Forest Supervisor upheld the DN/FONSI.

On January 14, 2005, the Court issued a decision in *Sierra Club v. Bosworth* (*Sierra Club Big Grass*), 352 F. Supp. 2d 909 (D. Minn. 2005).  In *Sierra Club Big Grass*, the Court considered a challenge to the Forest Service's Big Grass Project, which provided for timber harvest activities in a narrow corridor in between two sections of the BWCAW.  The Forest Service treated the case as new information under 40 C.F.R. § 1502.9 and prepared a Supplemental Information Report.  Based in part on differences between the location and recreational setting, road system and management, impacts to wilderness users, and cumulative impacts of the Big Grass Project and Tomahawk Project, the Forest Service concluded that the "information brought forward by the Court in the Big Grass decision has been appropriately addressed in the [TPEA], Decision Notice and project record . . . [and that] the FONSI for this project is appropriate to determine that an [EIS] is not necessary for the Tomahawk Project."

On March 31, 2005, Plaintiffs filed this action.  Plaintiffs claim the Forest Service violated NEPA, corresponding Council on Environmental Quality (CEQ) regulations, and the APA by failing to adequately analyze the environmental impacts of the Tomahawk Project.

Plaintiffs claim the project will "significantly affect" the adjacent BWCAW. Defendants maintain that the Forest Service properly identified and analyzed areas of environmental concern and provided a cogent rationale for its DN/FONSI.

## II.    DISCUSSION

### A.    Summary judgment standard and scope of review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The National Forest Management Act (NFMA) governs Forest Service activities in the SNF. *See* 16 U.S.C. §§ 1600-1614 (2000). The NFMA requires that the Forest Service prepare a land and resource management plan (forest plan)[3] for national forests. *Id.* § 1604(a). The Forest Service must prepare its forest plan in accordance with NEPA. *Id.* § 1604(g)(1). In addition, NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly

---

[3]    A forest plan is a broad, programmatic document, accompanied by an EIS and public review process.

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[4] An EIS must contain a "detailed statement" on the environmental impact of, any unavoidable adverse environmental effects of, the resource commitments involved in, and the alternatives to the proposed action. *Id.*; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976).

An agency may first prepare an environmental assessment (EA) to determine whether an EIS is required. 40 C.F.R. § 1508.9(a)(1). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."[5] *Id.* An EA must include "brief discussions" of the need for the proposal, of alternatives, of the environmental impacts of the proposed action and the alternatives, and a listing of agencies and persons consulted. *Id.* § 1508.9(b).

Plaintiffs' claims are asserted under the APA.[6] The Court reviews the Forest Service's decision not to perform an EIS under the "arbitrary and capricious" standard. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375 (1989). This standard gives agency decisions a high

---

[4]     Determining whether the proposed action "significantly" affects the environment requires consideration of a variety of factors, including the context and intensity of the project. 40 C.F.R. § 1508.27. "Affecting" is defined as "will or may have an effect on." *Id.* § 1508.3. "Human environment" includes "the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14.

[5]     An EA "cannot be both concise and brief and provide detailed answers for every question." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 840 (8th Cir. 1995). It is a "rough-cut, low-budget environmental impact statement." *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998) (quoting *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990)).

[6]     Plaintiffs allege that the boundaries of the BWCAW are uncertain. Lake County argues that this allegation indicates that Plaintiffs would have the Court order a complete survey of, and impose a ½ mile buffer around, the BWCAW. Lake County argues the Court is without jurisdiction to grant such relief and moves to dismiss Plaintiffs' action on this ground. The Court disagrees. Plaintiffs claim the Forest Service violated NEPA by failing to adequately analyze the environmental impacts of the Tomahawk Project. This claim is appropriate for judicial review. Accordingly, the Court denies Lake County's motion to dismiss for lack of jurisdiction.

degree of deference. *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001). The Court determines "whether the Forest Service considered the relevant factors or made a 'clear error of judgment.'" *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 838 (8th Cir. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The Court must affirm the Forest Service's decision if it took a "hard look" at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI. *See Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998); *Sierra Club*, 46 F.3d at 835.[7]

Plaintiffs claim the Forest Service failed to take a "hard look" at the Tomahawk Project and to make a convincing case that the impacts of the project are insignificant. More specifically, Plaintiffs claim the Forest Service issued the DN/FONSI despite the fact that the Tomahawk Project threatens significant harm to recreational users of the SNF, will significantly alter or threaten the wilderness characteristics of the BWCAW, and will occur without the required study of cumulative impacts of past and future timber projects along the BWCAW wilderness edge. The Forest Service argues it took a hard look at the Tomahawk Project, identified the relevant issues, analyzed alternatives, performed a detailed analysis of direct, indirect, and cumulative impacts, and provided a cogent rationale for the DN/FONSI.

## B.  Administrative record

### 1.  Tiering

Defendants assert the TPEA is "tiered" to the 2004 Forest Plan and, therefore, the 2004 Forest Plan and the underlying EIS guide the Court in its review of this case. Plaintiffs assert

---

[7]     NEPA does not require an agency to favor an environmentally preferable course of action; it instead prohibits uninformed, not unwise, agency action. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *Sierra Club v. Espy*, 38 F.3d 792, 802 (5th Cir. 1994). NEPA "imposes procedural requirements, but not substantive results on agencies such as the Forest Service." *Sierra Club*, 46 F.3d at 837 n.2.

that tiering the TPEA to the 2004 Forest Plan does not obviate the need for an EIS because NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment and because the 2004 Forest Plan EIS does not contain specific analysis of impacts to the BWCAW from the Tomahawk Project.

An agency may compile a large programmatic EIS and, as specific components are ready to be implemented, complete a site-specific EA. *See Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 430 (8th Cir. 2004). Agencies are encouraged to tier a subsequent EA to an EIS to save money and time by avoiding repetitive discussions and to focus on ripe issues. *See* 40 C.F.R. §§ 1502.20, 1508.28; *see also Newton*, 141 F.3d at 809.

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1502.28.

In this case, the Forest Service prepared an EIS for the broad 2004 Forest Plan and an EA for the TPA. The TPEA specifically stated that it is "'tiered' to the Forest Plan and the 1986 Final EIS on the Forest Plan, . . . [and that] [r]elevant discussion from these documents has been incorporated by reference rather than repeated." The TPEA also noted that the Forest Service was in the process of revising the prior forest plan while the Tomahawk Project was being developed and that the IPT considered the relevant information presented in the Draft EIS in preparing the TPEA. In addition, to the extent practical, the alternatives were developed to meet the intent of both the old plan and the 2004 Forest Plan. The 2004 Forest Plan and a final EIS were adopted prior to the signing of the DN/FONSI. These documents include discussions on issues relevant to the Tomahawk Project. In the DN/FONSI, the Forest Service again noted that

the purpose, need, and actions of the Tomahawk Project meet the intent of the 2004 Forest Plan. The Court concludes that it is appropriate for the Forest Service to "tier" its TPEA to the 2004 Forest Plan and underlying EIS, to the extent that the TPEA summarizes issues discussed therein. *See* 40 C.F.R. § 1502.20; *see also Ark. Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005) (explaining a final EA will be ruled deficient only if it does not include a cumulative impact analysis or is not tiered to an EIS that contains such an analysis).

> 2.   *Lake County's motion to supplement record*

Lake County moves to supplement the administrative record, which currently contains over 8,600 pages and multiple CD-ROMS, taking up approximately 35 binder volumes. Lake County seeks to add the 1979 certification of the description and map for the boundary of the BWCAW and an affidavit of a land surveyor. Lake County asserts that these documents are critical in light of Plaintiffs' assertion that the BWCAW border is uncertain.

The Court's review under the APA is generally limited to the administrative record that was before the agency when it made its decision. *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004). Limited exceptions have been recognized to allow supplementation. *Id.* If there is a contemporaneous administrative record and no need for additional explanation of the agency's decision, only a "strong showing of bad faith or improper behavior" will permit a court to allow supplementation. *Id.* Because the Court finds there is a contemporaneous administrative record, no need for further explanation of the Forest Service's decision, and no showing of bad faith or improper behavior, the Court denies Lake County's motion to supplement.

C.      *Sierra Club Big Grass* **case**

Plaintiffs attempt to characterize the TPA as unique because it is adjacent to the BWCAW and rely heavily on the Court's decision in *Sierra Club Big Grass* to support their argument that an EIS should have been prepared.  In *Sierra Club Big Grass*, the Court found the Forest Service's DN/FONSI for the Big Grass timber sale to be arbitrary and capricious insofar as it insufficiently analyzed the impacts of road construction on the BWCAW, the impacts on recreational users, and the cumulative impacts of timber sales and harvesting activities.  352 F. Supp. 2d at 924-27.  The Court in *Sierra Club Big Grass* noted, however, that in the Big Grass EA, the Forest Service acknowledged that the project area was "unique" due to its location in an "important corridor" between sections of the BWCAW and its high recreation use.  *Id.* at 915, 924-25.  The Big Grass project was located in a narrow corridor separating and connecting two units of the BWCAW.  Moreover, the Court in *Sierra Club Big Grass* noted the record "contains ample evidence that the Project area is used heavily year-round by recreational visitors [and] contains one of the most frequently traveled roads in the Forest (the Echo Trail)."  *Id.* at 925. Further, in determining that the Forest Service did not take the requisite hard look at certain impacts, the Court noted "[t]he severity of a project's impact is determined, in part, by whether the action's effects involve unique or unknown risks."  *Id.* (citing 40 C.F.R. § 1508.27(b)(5)).

Here, the record demonstrates the TPA is adjacent to the BWCAW, but does not share the other unique characteristics of the Big Grass Project that the Court in *Sierra Club Big Grass* found significant.  For example, the TPA does not lie in a narrow corridor connecting two separate portions of the BWCAW and, as discussed more fully below, the record does not establish that the TPA is used heavily year-round by recreational visitors.  Further, whereas the Big Grass project contained one of the most frequently traveled roads in the forest, the record

demonstrates that the TPA is accessed primarily via a graveled NFS road.  Finally, in the Big

Grass EA, the Forest Service specifically acknowledged the unique location of the project area.

In contrast, the Forest Service in the TPEA stated "[t]here are no known unique geographical

characteristics that will be significantly affected by the actions of this decision."

Based on the significant differences between the Tomahawk and Big Grass projects, and

the fact that Plaintiffs do not provide support for the assertion that an area is "unique" simply

because of its close proximity to BWCAW, the Court finds the *Sierra Club Big Grass* case

distinguishable from the case at hand.  The Court also addresses how this case differs from

*Sierra Club Big Grass* in its discussion of the impacts of the Tomahawk Project below.

**D.     Impacts of Tomahawk timber sale**

Plaintiffs argue that an EIS is required because environmental impacts of the Tomahawk

Project are significant.  Plaintiffs contend these impacts consist of adverse visual and noise

impacts, road construction impacts, and cumulative impacts from the Tomahawk Project and

other timber sales adjacent to the BWCAW.  Defendants argue that the Forest Service took a

hard look at the environmental impacts of the Tomahawk Project and issued a cogent rationale

for its DN/FONSI.

*1.     Visual and auditory impacts*

Plaintiffs argue that the Forest Service's decision was arbitrary and capricious given

adverse visual and noise impacts documented in the TPEA.  In particular, Plaintiffs assert that

significant visual and auditory effects on the BWCAW require the preparation of an EIS.  The

Court disagrees.  The chosen alternative, Alternative 4, involves clear cutting, thinning and/or

burning of approximately 5,876 acres of land, approximately 1,800 of which are within ½ mile

of the BWCAW.  In particular, harvesting of stands will occur near four entry points to the

BWCAW.  In the TPEA, the Forest Service identified the "concern that the proposed clear cutting, thinning and road activities adjacent to the BWCAW boundary and entry points would . . . diminish the experience of solitude for visitors due to noise and emissions from logging equipment and motorized vehicles."

The Forest Service considered the impacts of the Tomahawk Project to the BWCAW and its users.  In so doing, the Forest Service used several indicators:  the duration of the harvesting activity; the number of acres proposed for harvesting within ½ mile adjacent to the BWCAW boundary and the BWCAW entry points; the location and type of fire lines adjacent to the BWCAW boundary; and the miles of road built and road remaining open within ¼ mile of the BWCAW boundary.  The Forest Service also considered the number of people using each entry point.  Each entry point was discussed separately in the TPEA.  Specifically, the TPEA indicated that the nearest harvesting activity will occur ¼ mile from Entry Points 33 (Little Gabbro Lake) and 67 (Bog Lake) and ½ mile from Entry Points 75 (Little Isabella River) and 84 (Snake River).  All other stands within ½ mile of the BWCAW were also identified.  The TPEA further noted that from May 2003 through October 2, 2003: 1,184 people entered the BWCAW through Little Gabbro Lake, with an average party size of 3.69; 54 people entered through Bog Lake, with an average party size of 1.64; 306 people entered through Little Isabella River, with an average party size of 2.73; and 371 people entered through Snake River, with an average party size of 3.04.[8]  The TPEA indicated that the usage of these entry points was less during winter months.  In addition, the record contains a map demonstrating that the wilderness campsites on Bog Lake

---

[8]      The TPEA also noted that the maximum number of permits that could be issued per day for the respective entry points are as follows:  Little Gabbro Lake – 2; Little Isabella River – 1; Snake River – 1; and Bog Lake – 2.

and Little Gabbro Lake are one mile away from their entry points and that other campsites in the area are 1.5 miles or more away from the wilderness boundary.

The TPEA recognized that "machinery sounds and emissions could reduce wilderness users' feelings of solitude and fresh air" and that "[h]arvesting operations could be audible to users of the BWCAW."  However, the TPEA noted that harvesting near Little Gabbro Lake, Bog Lake, and Little Isabella River would occur only in the winter months and would be limited to 4-9 days, 5-10 days, and 3-14 days, respectively.  In addition, harvesting near Snake River would be limited to 6-28 days throughout the year, but no logging would be permitted "on weekends when wilderness use is more popular than during the weekdays."

The Forest Service analyzed the above indicators and concluded that, with respect to Alternative 4, "overall audible impacts and emissions would be short term and small in scope" at the entry points.  Moreover, the TPEA noted that "[r]ecreation is an important use of the project area and the serenity of the forest is valued by many recreational users.  However, noise for the action alternatives is expected to be of short duration and would generally occur during times of low recreational use when practical."  Finally, the DN/FONSI noted that the TPA "is considered 'Roaded Natural' . . . and sights and sounds of humans can be expected.  The Alternatives will not change this not [sic] will it change the amount of wilderness that provides a wilderness experience."

With respect to the Forest Service's consideration of visual impacts, the Forest Service identified concerns about "the effects of proposed actions on the quality of the scenery, particularly along popular roads, trails, recreation sites (dispersed and developed), and along waterways used by public."  The TPEA analyzed the impacts of scenery (visual quality) in the

TPA generally in response to these concerns.  This analysis is relevant to Plaintiffs' concerns.[9]

In particular, the TPEA analyzed the direct and indirect effects of Alternative 4, explaining:

> [the] effects to scenery from clearcutting and seed tree cutting would be minimal when the design features and mitigation measures in Chapter 2 are applied. Openings would be of a size that mimic those caused by natural processes, although they would not appear natural.  During harvest preparation, paint may be seen from travelways, although an attempt would be made to mark boundary trees so they would not be seen from travelways.  During actual harvest operations, equipment . . . would be seen moving over the harvest units.  Logs would also be stacked or "decked" in some cases before being removed to processing mills. Mitigations would be in place to prevent these from being seen from visually sensitive areas, but if no suitable location for landing or log decks is available outside these sensitive visual areas, they would be seen by visitors traveling through the area.  After harvest, reserve trees and legacy patches/reserve islands would be seen.  Much of the understory would be crushed, making these reserve trees stand out above the surrounding landscape without a gradual transition from clearcut to reserve patch/tree.  If site preparation burns are to be used prior to planting or natural regeneration, small piles of brush would be visible for a short time (less than 1 year).  After the burn is completed, blackened stems of reserve trees and underbrush would be visible until the grasses/forbs/wildflowers re-grew. This re-growth would occur within the first growing season following the burn. Longer term, blackened stems would be visible until the charring weathered away.  Once the understory attained about 3-5 feet of growth, the blackened stems would no longer be as visible.  This would take about 2 years or less.  If mechanical site preparation is completed, crews would be seen handplanting or seeding the area.  All of the above activities would take place over a period 1-2 years for each harvesting unit.  Leaving more reserve trees, leave islands or legacy patches, and locations of landings and seasonal operations restrictions (see mitigations in Chapter 2) would lessen direct and indirect impacts to scenery to acceptable levels.

The TPEA also noted that Alternative 4 would create openings larger than 200 acres, with some openings approaching 1,000 acres.  Although the TPEA recognized that even with the design features and mitigation measures, it would be possible to tell visually that a harvest operation was taking place, the TPEA also noted that these openings are allowed for in the Forest

---

[9]     Plaintiffs' arguments with respect to visual effects focus on the impacts on the BWCAW and its users.  Again, the TPEA specifically indicated that the nearest harvesting activity will occur ¼ to ½ mile from the relevant BWCAW entry points.

Plan and the reason for using them is to "mimic the larger scale disturbances that are typical of this landscape ecosystem."

Also with respect to Alternative 4, the TPEA acknowledged the possibility that users of Little Gabbro Lake and Bog Lake entry points might see smoke from prescribed burning that would last for approximately one day with residual smoke lasting about one week. The burning would be conducted in the early spring or late fall to avoid high use periods. The TPEA further identified other areas within ½ mile of the BWCAW that would be treated with prescribed burning and explained that the burns would take approximately one day to complete, with approximately one week of residual smoke. The TPEA added that prescribed burning in Alternative 4 would mimic natural processes, be short lived, and the "appearance of blackened trees and snags killed by fire would be expected to be viewed in a natural landscape."

In considering the visual effects of the Tomahawk Project, the TPEA also described the affected environment generally. For example, the TPEA noted that the project area is remote in character, the topography of the area is relatively flat, and that the view into forested stands is seldom more than 100 feet.[10] With respect to the TPA as a whole, the TPEA explained that certain lakes, roads, and trails have buffers in which timber harvesting is not allowed.

In addition, in Chapter 2 of the TPEA, the Forest Service outlined numerous design features meant to limit or avoid potential adverse visual effects, including features to (1) minimize the apparent size of openings; (2) avoid abrupt transitions between a cut area and an uncut stand; (3) maximize spacing between roadside and trailside openings; (4) minimize residue; (5) prevent views into a cut stand; (6) preserve existing trees in the immediate

---

[10] That the view into forested stands is limited is of particular significance, considering that harvesting activity will not occur closer than ¼ mile to any BWCAW entry point.

foreground of views from roads and trails; and (7) locate landings out of sight from visually sensitive travelways or viewpoints.

Based on the record, the Court concludes that the Forest Service's analysis is sufficient to demonstrate that the Forest Service took a hard look at the visual and auditory impacts of the Tomahawk Project, and in particular the impacts to the BWCAW and its users. In addition, the Forest Service identified the relevant areas of concern and made a convincing case that any impacts were not significant. The Forest Service's conclusion was not arbitrary and capricious.

2.      *Impacts on recreational users*

Plaintiffs allege that the Forest Service failed to fully analyze and support its conclusion that there would be no significant impacts on recreational users. Plaintiffs' argument centers on the TPA's close proximity to the BWCAW and its entry points. The Court addressed above the TPEA's analysis of the noise and visual impacts on visitors using the BWCAW entry points.

In the TPEA, the Forest Service identified the "concern about how the proposed activities will affect the recreational activities in the project area" and specifically addressed impacts to recreational users outside the BWCAW. In so doing, the Forest Service used two indicators: number of people traveling through the area to the BWCAW entry points and dispersed recreation sites in the project area within ¼ mile of proposed treatment units. The TPEA noted that the TPA is "roaded natural," "remote in character," with "no developed recreation sites." The TPEA explained there are several BWCAW entry points that fall within the project area and most people using the area visit during May to October and tend to drive through the area on their way to the entry points. In addition, the TPEA noted that there are several dispersed "user-developed" camping sites and that other types of recreation occur in the TPA, such as wildlife viewing, hunting, fishing, snowmobiling, use of ATVs, and wild plant gathering. The TPEA

charted both the number of people traveling to the BWCAW entry points within and adjacent to the TPA, as well as to the dispersed recreation sites within and adjacent to the TPA. The Forest Service also considered other factors affecting recreational use. In particular, the TPEA noted:

> Patterns to recreation use for the project area would not change appreciably under any of the action alternatives. Those seeking to use the BWCAW would continue to drive through on their way to the entry points. Usage of the BWCAW is governed more by weather and fire restrictions than by any management activities that occur outside the wilderness. Likewise, recreation in the project area itself would not change appreciably. . . . [W]eather has the greatest impact to recreation in the project area, not management activities. . . . .
>
> There would be minimal direct and indirect effects to the recreation from thinning activities. Hunters may see some positive effects, simply because they would be able to spot their quarry more easily in the more open stands. Similarly, the underburning proposed would also create a more open condition where game species could be more easily seen. The only difference would be the number of acres treated in the various alternatives.

The TPEA concluded that mitigation measures would protect dispersed sites and there would be no negative cumulative effects to recreation.

The Court notes that the TPEA discussed other potential impacts that could have a bearing on recreational users in the TPA. For example, the TPEA analyzed air quality, and in particular how prescribed burns will affect the air quality of campsites. The TPEA concluded that current air quality particulate standards would not be violated.

Based on the record, the Court concludes that the Forest Service's analysis is sufficient to demonstrate that the Forest Service took a hard look at the impacts on recreational users of the TPA, identified the relevant areas of concern, and made a convincing case that any impacts were not significant.[11] The Forest Service's conclusion was not arbitrary and capricious.

---

[11] The Court notes again that this case differs significantly from *Sierra Club Big Grass*. In *Sierra Club Big Grass*, the Court found that the Forest Service failed to fully analyze and support its conclusions that impacts, including visual and noise, on recreational users would be "short in

3.      *Road construction*

Plaintiffs argue that the Forest Service's decision was arbitrary and capricious given the adverse effects of road construction.  Specifically, Plaintiffs claim that the Forest Service failed to undertake an analysis of the impacts of the proposed road construction on the BWCAW and that the potential impacts of road construction and illegal use of closed roads in the TPA require preparation of an EIS.

In the TPEA, the Forest Service identified many concerns about the road management activities proposed in the TPA.  In particular, it identified concerns:

> about the development of nearly 25 miles of road in the project area because [some] think it would increase road density, contribute to an already fragmented landscape, facilitate illegal ORV and ATV use in sensitive areas, spread invasive-exotic species, and affect forest species and their habitats, and affect forest species and their habitats.  There are also concerns about the increased cumulative impacts that would result from the roads proposed in this project.

In addressing each alternative, the Forest Service considered two indicators:  miles of NFS road and miles of temporary road.  The Forest Service analyzed the direct, indirect and cumulative effects of the proposed road construction and noted that all alternatives would result in more NFS road, but fewer miles of road open to ATV and highway vehicles.  Under Alternative 4, the Forest Service proposed converting 14.6 miles of road to NFS road.  In addition, 15.6 miles of temporary road would be constructed or reopened.  The record indicates that 5.9 miles of existing NFS road would be decommissioned and obliterated, that temporary roads would be located so they do not connect with existing travel corridors, and that temporary

---

duration."   352 F. Supp. 2d at 925.   In so concluding, the Court noted that "Plaintiffs have demonstrated that the record contains ample evidence that the Project area is used heavily year-round by recreational visitors, [and] contains one of the most frequently traveled roads in the Forest (the Echo Trail)."  Plaintiffs have made no such showing on the record in this case.

roads would be obliterated and replanted after the harvesting activity.[12]   Further, the decommissioned roads would not be open to ATV use.  As a result of actions on unclassified roads and changes in objective maintenance levels of existing roads, Alternative 4 would ultimately result in 13.2 fewer miles of road open to highway vehicles and 5.8 fewer miles of road open to ATV use.

The TPEA analyzed the effects of roads on separate resource issues, such as access, soil productivity and wetlands, fragmentation, the BWCAW, and recreation outside the BWCAW. The TPEA also detailed the steps to be taken by the Forest Service to obliterate temporary roads after the harvesting activity is complete.  These steps include but are not limited to removing temporary bridges or culverts, randomly embedding rocks and placing stumps and slash on the road, and restoring the original ditch at the access point off the main road.

Plaintiffs challenge the efficacy of the mitigation measures and claim they will not protect the BWCAW from illegal incursions.  However, the DN/FONSI noted that in response to the concern about roads near the wilderness, it developed design features and mitigation measures to discourage illegal use in the wilderness that are "based on successful closure techniques used in the Gunflint Corridor EIS."   The record demonstrates that road closure methods proposed in the TPEA were monitored and recorded in a SNF Monitoring Summary. Also in the record are numerous photographs of various road closure techniques.  In addition, the record demonstrates that monitoring done in connection with road closures techniques within the SNF generally, and proposed in the TPEA, have been successful.[13]

---

[12]    Moreover, the record demonstrates that the Forest Service considered the fact that temporary roads would be ¼ mile from the BWCAW border and that a rider would "have to bushwack through dense balsam and shrubs in order to cross the Wilderness boundary."

[13]    The TPEA's analysis regarding any illegal use of closed roads, and in particular the efficacy of the selected mitigation measures, again differentiates this case from *Sierra Club Big*

Based on the administrative record, the Court finds that the Forest Service took the requisite hard look at the impacts of road construction, including the potential for illegal use of temporary roads by motorized vehicles.  In addition, the Forest Service identified the relevant areas of concern and made a convincing case that any impacts were not significant.  The Forest Service's conclusion was not arbitrary and capricious.

4.      *Cumulative impacts*

Plaintiffs allege that the Forest Service failed to adequately assess the cumulative effects of the Tomahawk Project and other SNF timber sales.  In particular, Plaintiffs claim the TPEA failed to include data or analysis regarding the impacts of other federal timber management projects adjacent to the BWCAW.  Plaintiffs also allege that the Forest Service did not analyze the cumulative effects of past timber sales.  Defendants contend that the Forest Service took a hard look at the cumulative impacts of the Tomahawk Project vis-a-vis past, ongoing, and reasonably foreseeable future timber harvests.

Plaintiffs cite to several cases in support of their argument that the TPEA's cumulative impact analysis is lacking.  *See, e.g.*, *Habitat Educ. Ctr., Inc. v. Boswoth*, 363 F. Supp. 2d 1070 (*Habitat I*) (E.D. Wis. 2005);  *Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1090 (*Habitat II*) (E.D. Wis. 2005).   The cases cited, however, confirm the Forest Service's obligations with respect to conducting a cumulative impact analysis in an EIS, not an EA.  *See, e.g., Habitat I,* 363 F. Supp. 2d at 1076 (noting that an EIS must contain a "detailed statement" of environmental impacts); *Habitat II*, 363 F. Supp. 2d at 1099 (same).  The Court reiterates that an EA is a "rough-cut, low-budget environmental impact statement."  *Newton*, 141 F.3d at 809

---

*Grass*.  *See* 352 F. Supp. 2d at 924 (noting lack of analysis of illegal use of closed roads and questionable efficacy of road closure technique).

(quoting *Cronin*, 919 F.2d at 443).   An EA "[s]hall include brief discussions of . . . the environmental impacts of the proposed action."   40 C.F.R. §1508.9.[14]   The Court has been provided with no controlling authority requiring an EA to contain the same level of analysis that is required in an EIS.   *Cf. Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994) ("When evaluating whether an EA complies with NEPA, we must be careful to avoid confusing NEPA's requirements for an EIS with those for an EA.").

Having carefully reviewed the record, the Court concludes the Forest Service took a hard look at the cumulative impacts of the Tomahawk Project and other timber sales.   In the TPEA, the Forest Service defined the relevant analysis area.   First, the Forest Service summarized past, present, and reasonably foreseeable future actions within and immediately adjacent to the TPA. The TPEA noted that "[o]ther vegetation management activities in the vicinity of the project area are the main consideration in assessing cumulative effects."   Second, with respect to impacts on the BWCAW, the analysis area was for all ownership in the TPA within ½ mile of the BWCAW. The TPEA noted that each resource specialist "determined the boundary for cumulative effects analysis based on accepted practices in their profession."   In response to a public comment asserting that a proper cumulative effects analysis should consider projects outside of the TPA, the TPEA noted that the "analysis area for cumulative effects varies by resource and is

---

[14]      A cumulative impact is:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.   Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

dependent on the geographic area where potential effects are relevant. Where appropriate, forest-wide analysis and monitoring is included in the cumulative effects analysis."[15]

In their Complaint, Plaintiffs do not allege that the Forest Service unreasonably determined the geographic area for which to conduct the cumulative analysis. However, in their opposition to Defendants' motion for summary judgment, Plaintiffs argue that the Forest Service failed to provide a reasoned explanation for the analysis area in the TPEA. The "identification of the geographic area" within which a cumulative impact analysis will be conducted "is a task assigned to the special competency of the appropriate agencies." *See Kleppe*, 427 U.S. at 414; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (deferring to agency's determination of the scope of its cumulative impact review in an EIS). Because there has been no showing that the Forest Service unreasonably determined the relevant geographic area in which to conduct its cumulative analysis, the Court concludes that the Forest Service's determination is not arbitrary and capricious.

In addition, the record demonstrates that the Forest Service took a hard look at the cumulative effects of timber harvests, including impacts to the BWCAW. The TPEA incorporated a table summarizing past, present, and reasonably foreseeable future actions within and immediately adjacent to the TPA. The table summary included harvest data (thinning, clearcutting, road construction, and prescribed burning) for all landowners—Forest Service, State, and private.[16] The TPEA also included a map of the approximate locations of these projects in relation to the BWCAW. It also specifically listed several past actions in the TPA,

---

[15]   For example, the analysis boundary for issues of forest structure, including age class, was expanded to consider "all National Forest System land in the Jack Pine/Black Spruce Landscape Ecosystem to put the project effects into the context of the broader ecosystem."

[16]   The administrative record contains underlying information regarding harvest estimates from the Minnesota Department of Natural Resources and private land owners.

including the Red Pine Thinning (1996), Thunder Horse (1997), Red Pine Thinning 2 (1998), and Red Pine and White Spruce Thinning (2002), and incorporated data for these past actions in the table summary and map.

Plaintiffs argue the Forest Service was required but failed to consider additional timber sales, in particular, Little East Creek, Holmes-Chipmunk, Plantation, Echo Trail, and Inga South management projects. The Court disagrees. First, the record demonstrates that the Holmes-Chipmunk project area is not adjacent to the BWCAW and that the Holmes-Chipmunk, Plantation, and Little East Creek project areas are not adjacent to the TPA.[17] Therefore, these projects are not within the Forest Service's analysis area, which the Court has already determined to be reasonable.[18] Accordingly, the Forest Service did not act arbitrarily and capriciously to the extent that it excluded these projects from its cumulative analysis. Moreover, the Forest Plan Revision EIS (FPREIS) considered the cumulative impacts of timber sales on the SNF as a whole. Defendants contend that because FPREIS used a model that considered projects that had been decided by NEPA as of February 2003, its analysis included the Big Grass EA, Little East Creek EIS, Gunflint Corridor EIS, Silver Lake EA, Crescent Lake EA, Holmes-Chipmunk EIS, and Plantation EA. Plaintiffs also argue that the Forest Service was required to analyze all timber sales along the BWCAW boundary regardless of their proximity to the TPA. The Court rejects this argument. Again, not all sales along the BWCAW boundary would fall

---

[17]    In addition, in the TPEA, the Forest Service specifically noted that the Big Grass, Silver Island, and Crescent Lake project areas overlapped with the TPA but did not include actions in the TPA.

[18]    Defendants also contend that neither the Inga South project nor the Echo Trail project is within the defined analysis area. Further, Plaintiffs' memorandum indicates that the initial scoping letters for these projects were released in April 2005, several months *after* the Tomahawk DN/FONSI was signed. Plaintiffs have provided no support for the proposition that the Forest Service acted arbitrarily and capriciously by not considering these actions, which were not yet proposals at the time the Tomahawk DN/FONSI was signed.

within the relevant analysis area.  Thus, to the extent that the Forest Service excluded these projects from its cumulative analysis, it did not act arbitrarily and capriciously.

The Court also notes that the 2004 Forest Plan and the accompanying EIS, upon which the TPEA is tiered, considered and analyzed cumulative impacts of timber harvests on the SNF. In addition, the Inga-Isabella Watershed study identified key resource issues and examined past and current conditions of the Inga-Isabella Watershed, which includes the TPA.  As part of the existing conditions analysis, the study discussed logging and forest management in the watershed.  Finally, in the TPEA, the Forest Service analyzed individual issues of concern determined by public involvement and the IPT.  These issues included but were not limited to, forest age class, forest composition, within stand diversity, old growth, role of fire, road access, BWCAW, visual quality, heritage resources, and recreation outside the BWCAW.  For each of these issues, the Forest Service discussed the four alternative proposals and each alternative's cumulative effects.  The Forest Service's analysis of these issues is relevant to its cumulative impacts analysis.  For example, the discussion of age class analyzed the condition of the forest and reflected all previous disturbances, including those from management activities.  The TPEA discussed the effects of other projects on age class distribution and included charts of the effects from past, present, proposed and future actions on forest structure in the TPA.

For the reasons stated above, the Court finds that the Forest Service took a hard look at the cumulative impacts of the Tomahawk Project and other federal timber management projects. *See Sierra Club*, 46 F.3d at 839 (finding Forest Service's FONSI adequate on cumulative impacts of activities on private lands where EA included private holding maps, aerial photographs, and where the record included road and watershed studies and other assessments;

finding EA properly assessed cumulative impacts of previous timber sales).   Thus, the

conclusion that there are no significant cumulative impacts was not arbitrary and capricious.

**E.       Uncertain nature of wilderness border**

Plaintiffs allege that the boundary of the BWCAW is uncertain.  Plaintiffs do not dispute

that the Forest Service published the coordinates of the statutory wilderness boundary, but claim

that the execution of the survey is often unreliable.   Because of the potential for inaccurate

survey, Plaintiffs contend an EIS is required.

The TPEA, in response to a comment from Friends,[19] explained that:

[a] [c]adastral team will survey the Wilderness boundary for the adjacent harvest
units prior to sale layout.   Layout personnel will utilize the boundary alarm
feature on realtime GPS equipment to ensure Wilderness boundary protection.
The boundary alarm feature has been used on other projects to identify unit
boundaries during layout (such as the Gunflint Corridor EIS) with a high degree
of success.

The DN/FONSI and the TPEA specifically state that such a survey will take place prior to sale

layout.  Plaintiffs do not dispute Defendants' assertion that the survey  method is consistent with

the requirements of the 2004 Forest Plan, which provides that before any resource activity occurs

adjacent to the BWCAW, the line will be established by a land survey.  Based on the record, the

Court concludes that the Forest Service took a hard look at the issue of the wilderness boundary

---

[19]       The comment reads:

The Friends also object to clearcutting in any of the above listed units because of
the potential for accidental logging across the wilderness boundary.   Due to
logging activities adjacent to the wilderness in the Little East Creek area, we
know that the wilderness boundary has not been surveyed.  We assume the exact
boundary has not been surveyed in the Tomahawk Project either.  Therefore, we
question how the Forest Service will ensure that cutting does not extend into the
BWCAW.

and did not act arbitrarily and capriciously in deciding to use the above-described survey method.

**F.      Consideration of alternatives**

Finally, Plaintiffs allege that the Forest Service failed to consider a full spectrum of reasonable alternatives in the TPEA.  The regulations require that the environmental impacts of the proposed action and alternatives be analyzed in an EA.  40 C.F.R. § 1508.9(b).  The Forest Service, however, is not required to consider alternatives that would not achieve the purposes of the proposed action.  *See Sierra Club v. Robertson*, 810 F. Supp. 1021, 1029 (W.D. Ark. 1992), *aff'd*, 28 F.3d 753 (8th Cir. 1994).

The purpose of the Tomahawk Project is to conduct management activity to maintain jack pine, to change the age-class distribution to more closely conform to the 2004 Forest Plan, to improve forest health and productivity of poorly stocked or decadent tree stands, to improve habitat for certain desired species, to update the current road system to access timberlands, and to provide timber to the local economy.  The TPEA considered and analyzed four alternatives. First, it considered a no action alternative.  Second, it considered a modified proposed action, aimed at creating young patches in the Jack Pine/Black Spruce Landscape Ecosystem using both harvest and prescribed fire.  Third, it considered a "thin/burn alternative," in which young forest would be created only using management ignited fire.  Fourth, it considered the proposed "Patch Alternative" (Alternative 4), which is aimed at moving toward the age-class composition, within-stand forest type and structural composition, and landscape spatial patterns for the Jack Pine/Black Spruce Landscape Ecosystem as described in the draft Forest Plan revision.  The record demonstrates that the Forest Service adequately evaluated a sufficient range of alternatives to permit a reasoned choice.

## III.   CONCLUSION

In sum, the Court finds that the Forest Service thoughtfully reviewed the Tomahawk Project, identified relevant areas of environmental concern, and made a convincing statement for its DN/FONSI.  Therefore, there was no requirement for the Forest Service to prepare an EIS.  Accordingly, the Court denies Plaintiffs' motion for a preliminary injunction, summary judgment, and a permanent injunction and grants Federal Defendants' motion for summary judgment.   In addition, Defendant-Intervenors moved for summary judgment on the same grounds as Federal Defendants, arguing that the Forest Service properly considered the impacts of the Tomahawk Project when making its DN/FONSI.   Therefore, Defendant-Intervenors' motions for summary judgment are granted.  Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.   Plaintiffs' motion for a preliminary injunction, summary judgment, and a permanent injunction [Docket No. 49] is DENIED.

2.   Federal Defendants' motion for summary judgment [Docket No. 65] is GRANTED.

3.   St. Louis County Land Department's motion for summary judgment [Docket No. 43] is GRANTED.

4.   Minnesota Forest Industries, Minnesota Tiber Producers Association, Hedstrom Lumber Co., and North Shore Forest Products', motion for summary judgment [Docket No. 66] is GRANTED.

5.   Lake County's motion to dismiss for lack of jurisdiction [Docket No. 79] is DENIED.

6.   Lake County's motion for summary judgment [Docket No. 80] is GRANTED.

7.   Lake County's motion to supplement the administrative record [Docket No. 54] is DENIED.

8.      Plaintiffs' Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 21, 2006

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge